Khapabhai Dahyabhai PATEL and Pramilaben Khapabhai Patel, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 79–7284.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 2, 1980.

Decided Oct. 22, 1980.

Rehearing and Rehearing En Banc Denied March 30, 1981.

---

Michael D. Ullman, of Bert D. Greenberg, Inc., Beverly Hills, Cal., for petitioners.

Lawrence B. Gotlieb, Asst. U. S. Atty., Los Angeles, Cal., for respondent.

Before Chief Judge MARKEY,* and Circuit Judges WALLACE and SKOPIL.

WALLACE, Circuit Judge:

In August 1970, Khapabhai D. Patel (Patel), a citizen of India, entered the United States as a nonimmigrant student authorized to stay until July 31, 1974. Patel's wife, Pramilaben K. Patel, entered the United States in July 1972 as the spouse of a nonimmigrant student, also authorized to stay until July 31, 1974. The Patels failed to depart at the end of their authorized stay, and the Immigration and Naturalization Service (INS) issued an Order to Show Cause and Notice of Hearing which charged that the Patels were deportable. At a deportation hearing held in October 1977, the

* Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

Patels admitted their deportability, but applied for adjustment of status under 8 U.S.C. § 1255, and suspension of deportation under 8 U.S.C. § 1254(a)(1). The Immigration Judge denied both applications and granted voluntary departure. The Board of Immigration Appeals (Board) affirmed. We affirm in part and reverse and remand in part.

I

8 U.S.C. § 1255 provides that the Attorney General, in his discretion, may adjust the status of a deportable alien to that of an alien lawfully admitted for permanent residence. To be eligible for such discretionary action an alien must, among other things, be eligible for an immigrant visa. 8 U.S.C. § 1255(a)(2). Aliens like Patel, who will enter the American work force if admitted for permanent residence, are not eligible for immigrant visas unless the Secretary of Labor certifies that their presence in the United States will not be detrimental to the American labor force. 8 U.S.C. § 1182(a)(14). This labor certification requirement may be avoided, however, if the alien comes within a regulatory exception known as the "investor exemption." At the time of Patel's application for adjustment of status the investor–exemption regulation provided:

> (b) *Aliens not required to obtain labor certifications.* The following persons are not considered to be within the purview of section 212(a)(14) of the Act and do not require labor certification: ... (4) an alien who establishes ... that he is seeking to enter the United States for the purpose of engaging in a commercial or agricultural enterprise in which he has invested, or is actively in the process of investing capital totaling at least $10,000, and who establishes that he has had at least 1 year's experience or training qualifying him to engage in such enterprise.

8 C.F.R. § 212.8(b)(4) (1974).

Patel attempted to establish his eligibility for adjustment of status by qualifying for the investor exemption. He introduced evidence that in 1974 he invested $13,500 in a motel, and that prior to his arrival in the United States he had worked in an Indian guest house for more than one year. Despite Patel's apparent compliance with the criteria stated in 8 C.F.R. § 212.8(b)(4), the Board affirmed the Immigration Judge's conclusion that Patel did not qualify for the investor exemption. This conclusion was based upon the Board's holding that, in addition to the investment of $10,000 and one year of experience in the field of investment, an alien's investment "must tend to expand job opportunities" in the United States. Patel contends that the Board erred in applying this additional requirement, and that he established his eligibility for adjustment of status by compliance with the clear criteria of 8 C.F.R. § 212.-8(b)(4). At oral argument the government agreed that Patel had proven a $10,000 investment and one year of experience in the motel business. Thus, if the Board erred in requiring that the investment expand job opportunities, Patel is eligible for section 1255 relief and we must remand so that the INS may exercise its discretion to grant or deny adjustment of status.

In requiring that Patel's investment expand American jobs, the Board purported to be following two of its previous decisions, *In re Ruangswang,* I.D. 2546 (BIA 1976), and *In re Heitland,* 14 I. & N. Dec. 563 (BIA 1974). "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). Thus, we must determine whether the Board erred by relying upon *Heitland* and *Ruangswang* to add a job–creation requirement to an already clear regulation. Essential to this determination is the history of the investor exemption.

The investor exemption was created by regulation.[1] When first promulgated,

---

1. The Attorney General has authority to promulgate regulations governing immigration to the United States, 8 U.S.C. § 1103(a), and he has delegated that authority to the INS. 1

the regulation simply required that an alien engage in an agricultural or commercial enterprise in which he had invested a "substantial amount of capital." 8 C.F.R. § 212.8(b)(4) (1967). The Board did not interpret this regulation as requiring any minimum capital outlay, but rather as requiring an investment that was substantial relative to the capital required to operate the enterprise. *In re Finau*, 12 I. & N. Dec. 86, 88–89 (BIA 1967). In addition, the Board examined the skills of the alien and the likelihood of his or her success in the enterprise. *Id.*

The INS introduced the idea that an investment must expand job opportunities in late 1972. It proposed an investor–exemption regulation which required a minimum investment of $25,000 in an enterprise "reasonably . . . expected to be of prospective benefit to the economy of the United States and not intended solely to provide a livelihood for the investor and his family . . . ." 37 Fed.Reg. 23274 (1974). After public comment on this proposed regulation, however, the INS eliminated the requirement that the investment benefit the economy. 38 Fed.Reg. 1379 (1973). Instead, the INS promulgated the regulation applicable to Patel and quoted earlier in this opinion, which requires an investment of $10,000 and one year of experience in a similar enterprise. 8 C.F.R. § 212.8(b)(4) (1974).

After the promulgation of this new regulation in 1973, the Board decided *Heitland, supra*, 14 I. & N. Dec. 563, a case arising under the "substantial amount of capital" requirement of the pre–1973 regulation. *Heitland* overruled previous Board interpretations of "substantial," and stated that the alien's investment "must tend to expand job opportunities and thus offset any adverse impact which the alien's employment may have on the market for jobs . . . ." 14 I. & N. Dec. at 567. Although *Heitland* was

concerned only with the pre–1973 "substantial amount of capital" requirement, it stated in dicta that the recently–promulgated and facially–objective 1973 regulation must also be construed to require that the investment expand job opportunities. *Id.* at 566–67. Thus, by adjudication, the Board attempted to add a requirement to the 1973 regulation which had been expressly discarded during its rule–making proceedings.[2]

The Board applied the job–creation criterion of *Heitland* to facts arising under the 1973 regulation in *Ruangswang, supra*, I.D. 2546. Despite the clear requirements of a $10,000 investment and one year of experience, the Board followed the *Heitland* dicta and held that an alien must also show that the investment will tend to expand job opportunities. On appeal, we reversed the Board's application of the *Heitland* criterion. *Ruangswang v. INS*, 591 F.2d 39 (9th Cir. 1978). Addressing the narrow issues presented before us, we held that *Heitland* was not a valid adjudicatory interpretation of the 1973 regulation because it was " 'clearly contrary to the plain and sensible meaning of the [1973] regulation.' " *Id.* at 43, *quoting Hart v. McLucas*, 535 F.2d 516, 520 (9th Cir. 1976). In addition, we concluded that even if *Heitland* was a valid adjudicatory creation of an agency standard, the Board abused its discretion by applying that standard to Ruangswang who had no notice of its existence. *Id.* at 45. On the basis of this lack of notice, we also distinguished *Mehta v. INS*, 574 F.2d 701 (2nd Cir. 1978), a case which had approved a Board application of the *Heitland* criterion to the 1973 regulation. We were thus not required to pass upon the merits of *Mehta*. Consequently, in *Ruangswang* we did not consider the substantive question now properly before us: whether the Board may rely

Gordon & Rosenfield, Immigration Law and Procedure § 1.8 (1980).

**2.** In 1976 the INS again amended its regulation, this time including the express requirement "that the enterprise will employ a person or persons in the United States who are United

States citizens or aliens lawfully admitted for permanent residence, exclusive of the alien, his spouse and children." 41 Fed.Reg. 37565 (1976). *See* 8 C.F.R. § 212.8(b)(4) (1977). This subsequently amended regulation, of course, does not apply to Patel.

upon *Heitland* to add a job–creation criterion to the facially–clear 1973 regulation.[3]

■ The Supreme Court has determined that an administrative agency, such as the INS, "is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). *See also SEC v. Chenery Corp., supra*, 332 U.S. at 202–03, 67 S.Ct. at 1580–1581; *NLRB v. Children's Baptist Home of Southern California*, 576 F.2d 256, 260 (9th Cir. 1978). But, like all grants of discretion, "there may be situations where the [agency's] reliance on adjudication would amount to an abuse of discretion . . . ." *NLRB v. Bell Aerospace Co., supra*, 416 U.S. at 294, 94 S.Ct. at 1771. Thus, we must determine whether the Board abused its discretion by choosing to announce the job–creation criterion in the adjudicatory setting of *Heitland*, rather than waiting for INS promulgation of the criterion in rulemaking,[4] and by applying the job–creation criterion to Patel.

In *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), the Supreme Court invalidated a "rule" which the National Labor Relations Board (NLRB) created by adjudication. The rule was created in *Excelsior Underwear Inc.*, 156 N.L.R.B. 1236 (1966), in which the NLRB announced that all employers would thereafter be required to give employee names and addresses to any union seeking to win a representation election at the employer's business. In *Excelsior*, the NLRB held a quasi–rulemaking hearing by invit-

ing selected parties to participate in the adjudication as amicus curiae, and by stating that the new requirement would become effective 30 days from the date of the decision. *NLRB v. Wyman–Gordon Co., supra*, 394 U.S. at 763, 89 S.Ct. at 1428. Although the lead opinion in *Wyman–Gordon* was not supported by a majority of the Court, the plurality found that the *Excelsior* decision was an impermissible circumvention of rulemaking procedures mandated by the Administrative Procedure Act (APA). *See NLRB v. Wyman–Gordon Co., supra*, 394 U.S. at 762–66, 89 S.Ct. at 1427–1430 (plurality opinion), 775–80, 89 S.Ct. at 1434–1437 (Douglas, J., dissenting), 780–83, 89 S.Ct. at 1437–1439 (Harlan, J., dissenting). The plurality did not prohibit agencies from announcing principles by adjudication which may later govern agency actions as precedent. 394 U.S. at 765–66, 89 S.Ct. at 1429–1430. Rather, the Court forbad agencies from promulgating a "rule," which the APA defines as "an agency statement of general or particular applicability and future effect . . .," 5 U.S.C. § 551(4), in an adjudicative proceeding. It was the prospective pronouncement of a broad, generally applicable requirement, without application of the requirement to the parties before the NLRB in *Excelsior*, which the Court declared improper in *Wyman–Gordon*.

*Heitland*, like *Excelsior*, created a broad requirement of prospective application. It stated that aliens attempting to qualify for the investor exemption under the 1973 regulation would be required to show, in addition to requirements set forth in the regula-

---

3. Patel did not lack notice of *Heitland* as did the petitioner in *Ruangswang*. *Heitland* was decided in January 1974. Patel began investing in the motel in July of that year and submitted his application for adjustment of status, in which he claimed the investor exemption, in April 1976. Thus we must address the issue here which we were not required to reach in *Ruangswang*.

4. *See* note 2, *supra*.

   Although the Board and the INS are separate entities within the Department of Justice, 1 Gordon & Rosenfield, Immigration Law and

Procedure § 1.10b at 1–62 (1980), both are delegatees of the Attorney General in whom Congress has vested both rulemaking and adjudicatory powers. We do not believe that the organizational structure of the bodies to which the Attorney General has delegated his rulemaking and adjudicatory authority determines the applicability of the administrative law principles applicable in this case. Previous cases considering Board adjudicatory actions appear to agree. *See, e. g., Ruangswang v. INS*, 591 F.2d 39 (9th Cir. 1978); *Mehta v. INS*, 574 F.2d 701 (2d Cir. 1978).

tion, that their investment expands job opportunities in the United States. Only months before, the INS itself had recognized the desirability of establishing a job–creation standard by rulemaking when it proposed the 1973 regulation. *See* 37 Fed. Reg. 23274 (1972); 38 Fed.Reg. 1379 (1973). The INS eventually failed to include the job–creation standard in its rule. Under the authority of *Wyman–Gordon*, we conclude that if the INS wished to add the job–creation criterion, it should have done so in a rulemaking procedure. *See* 2 Davis, Administrative Law Treatise § 7:25 at 124 (1979).

■ We recognize, of course, that there are differences between *Heitland* and *Excelsior*. Unlike the NLRB in *Excelsior*, the Board in *Heitland* applied the job–creation criterion to the alien before it (although the criterion in *Heitland* was applied to the "substantial amount of capital" requirement of the pre–1973 regulation, not to the 1973 regulation which was in effect for purposes of the instant case); and the Board in *Heitland* did not attempt a quasi–rulemaking procedure as did the NLRB in *Excelsior*. Nonetheless, *Heitland* did prospectively pronounce a broad, generally applicable requirement, without then applying that requirement to aliens seeking exemptions under the 1973 regulation. It was an abuse of discretion to thus circumvent the rulemaking procedures of the APA.[5]

*SEC v. Chenery Corp., supra,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 and its progeny, *NLRB v. Bell Aerospace Co., supra,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d

134 support this conclusion. Although both cases recognized an agency's right to act by adjudication, *Chenery* stated that the function of carrying out statutory directives "should be performed, as much as possible, through th[e] quasi–legislative promulgation of rules to be applied in the future." *SEC v. Chenery Corp., supra,* 332 U.S. at 202, 67 S.Ct. at 1580. *See also Bell Telephone Co. of Pennsylvania v. FCC,* 503 F.2d 1250, 1265 (3rd Cir. 1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), and authorities cited therein. In addition, *Chenery* specified limited circumstances in which adjudication would be preferable to rulemaking:

> [P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case–to–case basis if the administrative process is to be effective. There is thus a very definite place for the case–by–case evolution of statutory standards.

*SEC v. Chenery Corp., supra,* 332 U.S. at 202–03, 67 S.Ct. at 1580–1581. When the Court in *Bell Aerospace* deferred to the NLRB's decision to act by adjudication, it

---

5. We recognize that our decision in this case disagrees with the Second Circuit's decision in *Mehta v. INS,* 574 F.2d 701 (2d Cir. 1978). We avoided that collision in *Ruangswang v. INS,* 591 F.2d 39 (9th Cir. 1978). We cannot do so here. *Mehta* concluded that "[s]ince the Board . . . interprets and applies INS regulations in the context of specific appeals, the Board's individual decisions do not constitute 'substantive rules . . . .'" *Id.* at 705, *quoting* 5 U.S.C. § 552(a)(1)(D). *Mehta* also found "no factual basis for a claim of unfairness or undue hardship" to the alien before it. 574 F.2d at 705.

It is undoubtedly true that in most cases the Board simply "interprets and applies INS regulations." However, we concluded in *Ruang-* *swang* that *Heitland* was not a valid "interpretation" of INS regulations. *Id.* at 43–44. We now conclude that *Heitland's* prospective pronouncement of a broad, generally applicable requirement, amounts to "an agency statement of general or particular applicability and future effect . . .," 5 U.S.C. § 551(4), and should have been adopted by rulemaking. Moreover, this case does present a factual basis for a claim of unfairness or undue hardship to Patel. Therefore, we choose to differ with the Second Circuit. We conclude that *Heitland* was an improper circumvention of rulemaking procedures and that its job–creation criterion was improperly applied to Patel.

was in just such a circumstance. The Court stated:

Indeed, there is ample indication that adjudication is especially appropriate in the instant context. As the Court of Appeals noted, "[t]here must be tens of thousands of manufacturing, wholesale and retail units which employ buyers, and hundreds of thousands of the latter." 475 F.2d, at 496. Moreover, duties of buyers vary widely depending on the company or industry. It is doubtful whether any generalized standard could be framed which would have more than marginal utility. The Board thus has reason to proceed with caution, developing its standards in a case–by–case manner with attention to the specific character of the buyers' authority and duties in each company.

*NLRB v. Bell Aerospace Co., supra*, 416 U.S. at 294, 94 S.Ct. at 1771–1772. In contrast, the job–creation criterion of *Heitland* does not call for a case–by–case determination. It may be stated and applied as a general rule even though the result may vary from case to case. *See* 8 C.F.R. § 212.8(b)(4) (1977).

In addition to our conclusion that *Heitland* was an improper circumvention of rulemaking procedure, we also conclude that the Board abused its discretion by applying the job–creation criterion to Patel. Although Patel invested money and applied for the investor exemption well after *Heitland* was decided, we doubt that he could have clearly determined what he must do to qualify for the exemption. The INS had been sending aliens confusing signals. In promulgating the 1973 regulation, the INS had expressly eliminated language similar to the job–creation criterion of *Heitland*. When the Board decided in *Heitland* that the criterion applied to the out–of–date, pre–1973 regulation, it only obscurely stated in dictum that it would also be applied to the 1973 regulation. *In re Heitland, supra*, 14 I. & N. Dec. at 566–67. It was not until 1976 that the regulation was amended to include clearly the job–creation criterion.[6]

The hardship Patel has experienced as a result of his failure to comply with the job–creation criterion is great. As the Supreme Court has said:

Here the liberty of an individual is at stake. ... [D]eportation ... visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty–at times a most serious one–cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

*Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945). In view of the agency's confusion with respect to the job–creation criterion and the resulting hardship to Patel, we hold that the Board abused its discretion in applying that criterion in this case. Thus, we reverse the Board's denial of Patel's application for adjustment of status, and remand to the Board for exercise of discretion in relation to that application.[7]

## II

■ 8 U.S.C. § 1254(a) provides that the Attorney General, in his discretion, may suspend deportation of an alien and adjust his or her status to that of an alien lawfully admitted for permanent residence. To be eligible for such relief the alien must establish (1) continuous presence in the United States for at least seven years, (2) good moral character, and (3) extreme hardship to himself or to his spouse, parent, or child, who is a United States citizen or a lawful permanent resident. 8 U.S.C. § 1254(a)(1). The alien seeking suspension of deportation bears the burden of proving eligibility, *Pelaez v. INS*, 513 F.2d 303, 305 (5th Cir.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 190, 36 L.Ed.2d 124 (1975), and even if eligibility is established, the Attorney General may deny

---

6.  *See* note 2, *supra*.

7.  Because more fundamental principles resolve the questions before us in this case, we do not

decide under what circumstances, if any, an agency may amend regulations by adjudication.

suspension of deportation in the exercise of his discretion. *Fong Choi Yu v. INS,* 439 F.2d 719, 719 (9th Cir. 1971).

Patel's application for suspension of deportation was denied by the Immigration Judge and the Board because he failed to establish that deportation would inflict extreme hardship on himself or his citizen child.[8] Patel contends that he proved his eligibility by introducing evidence that deportation would significantly reduce his standard of living, and would sever the close community ties that he and his family have developed in the United States. He also contends that his citizen child would suffer educational, dietary, and economic disadvantages by deportation. "[O]ur scope of review is limited to determining whether the board, in view of the evidence presented, abused its discretion in finding that petitioner was not eligible for suspension of deportation under 8 U.S.C. § 1254." *Carrasco–Favela v. INS,* 445 F.2d 865, 866 (9th Cir. 1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1302, 31 L.Ed.2d 488 (1972). *See Banks v. INS,* 594 F.2d 760, 762 (9th Cir. 1979); *Davidson v. INS,* 558 F.2d 1361, 1362–63 (9th Cir. 1977).

We have previously held that economic disadvantage does not constitute extreme hardship. *Davidson v. INS, supra,* 558 F.2d at 1363; *Blanco–Dominguez v. INS,* 528 F.2d 382, 383 (9th Cir. 1975); *Kasravi v. INS,* 400 F.2d 675, 676 (9th Cir. 1968). As the Board observed, Patel has a college degree in engineering and has not shown that he will be unable to find gainful employment in India. Nor do we view severance of community ties as extreme hardship. Such severance occurs every time a person relocates. Any alien who has spent seven years in the United States has undoubtedly developed such ties, and viewing severance of those ties as extreme hardship would make the third requirement of section 1254(a)(1) trivial.

We have also held that an alien cannot gain favored status merely by the birth of a citizen child. *Choe v. INS,* 597 F.2d 168, 170 (9th Cir. 1979); *Banks v. INS, supra,* 594 F.2d at 762. The Board found that the young age of Patel's citizen child would minimize readjustment difficulties. The Board also observed that Patel's return to India would unite his citizen child with a brother and sister currently living there. We conclude that the Board did not abuse its discretion in determining that Patel had failed to establish extreme hardship. Thus, we affirm the Board's denial of his application for suspension of deportation.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

8. Patel's wife did not apply for suspension of deportation because she had not lived continuously in the United States for seven years as required by 8 U.S.C. § 1254(a)(1).